**Willie Lewis SHERMAN,**
**Plaintiff–Appellee,**

v.

**BURKE CONTRACTING, INC., and William E. Burke, Defendants–Appellants.**

**No. 88–8382.**

United States Court of Appeals,
Eleventh Circuit.

Jan. 16, 1990.

M. McNeill Holloway, III, Thomson, Ga., E. Ray Stanford, Jr., Atlanta, Ga., for defendants-appellants.

John P. Batson, Jacque D. Hawk, Hawk, Hawk, & Lyons, Augusta, Ga., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, EDMONDSON, Circuit Judge, and ATKINS *, Senior District Judge.

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

PER CURIAM:

## I.

Willie Lewis Sherman brought this suit against his former employer, Burke Contracting, Inc., and its president and principal owner, William Burke, (collectively Burke) seeking recovery for two acts of racial discrimination. Sherman's complaint contained five counts alleging violations of federal civil rights statutes and Georgia tort law.[1] All of the counts were based on two factual episodes. The first episode occurred when Burke terminated Sherman's employment. According to the complaint, Burke did so because Sherman, a black man, was married to a white woman. Sherman subsequently complained to the Equal Employment Opportunity Commission (EEOC), contending that Burke fired him on account of his race. The second episode occurred a few days after Sherman had found work with another contractor, Palmer Construction Co. (Palmer). Sher-

man alleged that Burke, in retaliation against him for complaining to the EEOC, persuaded Palmer to fire him.[2]

Sherman asked the court to order Burke to restore him to his former position with the company and to award him back pay. Sherman also sought $50,000 in compensatory damages, $1,000,000 in punitive damages, and reasonable attorney's fees and costs.

■ Burke moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim.[3] The court denied the motion. Burke then answered the complaint, denying the alleged wrongdoing. Prior to trial, the parties entered into a pretrial stipulation, approved by the court, which provided for a bifurcated jury trial. The parties would first try the issue of liability; if the jury found for Sherman, the court would then recall the jury to consider damages.[4]

1. Count one was brought under 42 U.S.C. § 1985(3) (1982), count two under 42 U.S.C. § 1981 (1982), count three under 42 U.S.C. § 1983 (1982), count four under 42 U.S.C. §§ 2000e–2(a)(1), –3(a) (1982), and count five under Georgia tort law. The only claims before us are those founded on 42 U.S.C. §§ 1981 and 2000e–3(a). Section 1981 provides that:

 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

 42 U.S.C. § 1981. Section 2000e–3(a) provides that:

 It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. *Id.* § 2000e–3(a).

2. As indicated in the text and in note 1, *supra,* the complaint contained five counts, each based on two independent factual episodes. Hence, the complaint could be read as presenting as many as 10 claims, two in each of the five counts. The exact number of distinct claims

Sherman presented to the court was not settled, however, until the jury had returned its verdicts *and* the court had ruled on Sherman's motion to clarify the final judgment. In making its ruling, the court indicated, albeit by implication, that the final judgment disposed of three claims (in addition to those disposed of by directed verdict). The first was a claim against Burke under 42 U.S.C. § 2000e–2(a)(1) for firing him because he was married to a white woman; under that claim, Sherman sought to regain his job and back pay. The second and third were claims against Burke under 42 U.S.C. §§ 1981 and 2000e–3(a) for its conduct in causing Palmer to fire Sherman.

3. The defendants also moved to dismiss on other grounds, none of which is relevant here.

4. Our precedent indicates that Sherman had a right to have his section 1981 claim tried to a jury. *See Lincoln v. Board of Regents,* 697 F.2d 928, 934 (11th Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983). Sherman, however, had no right to a jury trial of his section 2000e–2(a)(1) claim. The law provides that such a claim lies in equity, *see* 42 U.S.C. § 2000e–5(g) (1982) (limiting an employee's relief under Title VII to injunction against unlawful employment practices and reinstatement, back pay, or any other equitable relief as court deems appropriate). Thus, regarding Sherman's section 2000e–2(a)(1) claim, the jury could serve in an advisory capacity only. *See* Fed.R.Civ.P. 39(c). In sum, the jury's verdict bound the court on the section 1981 claim but

At trial, the parties chose to present the case as if it consisted of two claims rather than the several claims stated in Sherman's complaint. As Sherman explained in his opening statement, he contended that Burke had violated the "United States Code" on two occasions—when it terminated him because his wife was white and when it persuaded Palmer to fire him in retaliation for his EEOC complaint. Burke, on the other hand, denied that it had violated the Code by terminating Sherman or that it had caused Palmer to terminate him as a retaliatory measure in violation of the Code.

Sherman introduced evidence to establish his factual allegations. Burke then moved for a directed verdict on each claim.[5] The court granted Burke's motion in part, striking all of Sherman's claims except those brought under 42 U.S.C. §§ 1981, 2000e–2(a)(1), and 2000e–3(a) (1982). At the close of its case, the defense moved for a directed verdict on the remaining claims. Burke, however, failed to explain why the remaining claims were deficient, and the court summarily denied the motion.

The court then held a charge conference; apparently, the parties were uncertain how the court should instruct the jury. The court decided to give a "conversational" charge, built around two special interrogatories that would, in effect, determine the liability issues. *See generally* Fed.R.Civ.P. 49(a).

In its instruction to the jury, the court stated that Sherman had two claims. The first claim was that Burke had violated the nondiscrimination provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) (1982), when it terminated Sherman because he was married to a white woman.[6] The court instructed the jury on the elements of a section 2000e–2(a)(1) claim and asked it to answer the following question: "1. Was the race of the plaintiff ..., or the fact of his marriage to Debbie Sherman, a substantial motivating factor in any decision to terminate his employment by [Burke]?"

Sherman's second claim, according to the court, was that Burke had violated 42 U.S.C. § 1981 (1982) by persuading Palmer to fire Sherman because he had complained to the EEOC. On this claim, the court asked the jury the following question:

3. Did either defendant intentionally discriminate against the plaintiff on account of his race so as to infringe upon his right:

(a) to make and enforce a contract of employment?

(b) to sue, be a party to an action or give evidence?

The jury answered question one in the negative, thus exonerating Burke on the section 2000e–2(a)(1) claim. It answered both paragraphs of question three in the affirmative, however, thus finding for the plaintiff on the section 1981 claim.

The court then recalled the jury to determine the issue of damages under section 1981. The jury awarded Sherman $10,000 in compensatory damages and $12,500 in

not on the section 2000e–3(a) claim. The record does not indicate whether the parties comprehended this distinction. The court evidently did, though, when it considered Sherman's request to clarify the final judgment and specify whether he had obtained relief under section 2000e–3(a). As the text indicates, *infra*, the court considered the jury's answers to the special interrogatories and, purportedly exercising its equity power under section 2000e–5(g), granted Sherman the same money damages under section 2000e–3(a) as the jury had awarded him under section 1981.

5. In moving for directed verdicts, defense counsel did not refer to Sherman's claims as set forth in his complaint; rather, counsel simply asked the court to dismiss Sherman's case.

6. Section 2000e–2(a) provides, in pertinent part, that:

It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 2000e–2(a) (1982).

punitive damages, and the court subsequently entered judgment against Burke in the amount of $22,500.[7]

Burke immediately moved for judgment n.o.v. or, alternately, for a new trial, but the court denied the motions. Sherman then moved for a clarification of the court's final judgment, which had not stated upon what count, or counts, of the complaint it was based. Sherman wanted the court to specify that the judgment gave him relief on his retaliation claim under section 2000e–3(a), as well as under section 1981. The court granted his motion and entered the following order:

> Willie Lewis Sherman, the prevailing party in the above-captioned case, asks the Court to "clarify" the judgment entered in this case on February 29, 1988, following a two-day jury trial. The jury's findings of fact [i.e., its answer to question three], of course, related solely to plaintiff's causes of action [against Burke] under 42 U.S.C. § 1981. In view of the need to demonstrate a proper regard for the vital and necessary function of the jury in our judicial system, I am prepared to accept and adopt as my own these findings with respect to Sherman's Title VII claim [under section 2000e–3(a) ] as well and to award him no further relief than that provided for under

the verdict. Judgment is hereby entered accordingly [in the sum of $22,500].[8]

Burke appeals from this judgment.

## II.

Burke raises two issues that require discussion. The first is whether an employer can be held liable under 42 U.S.C. § 2000e–3(a) (1982) for retaliating against an employee after an employment relationship has terminated.[9] The second is whether the district court erred in allowing the jury to hear certain incriminating evidence over Burke's objection.[10] We raise a third question *sua sponte* in light of the Supreme Court's decision in *Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), which the Court handed down after oral argument in this case: whether Sherman can recover from Burke under section 1981 for interfering with the employer-employee relationship between Palmer and Sherman. If Sherman cannot recover under section 1981, a fourth question then arises: whether Sherman's punitive damages award is sustainable under section 2000e–3(a). We address these issues in order.

## A.

■ Section 2000e–3(a) makes it unlawful for an employer "to discriminate against any of his employees" because they have filed a complaint with the EEOC. Re-

---

7. The final judgment does not specify whether the court entered judgment against the defendants jointly or jointly and severally. The issue whether defendants could be held jointly or jointly and severally liable did not arise at trial nor does it arise on appeal.

8. Burke raised no objection in the district court, nor does it in this appeal, to the court's use of the jury's answer to question three, which related to the section 1981 claim, in deciding the section 2000e–3(a) retaliation claim. Nor has Burke objected to the district court's failure to issue findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a), in deciding the section 2000e–3(a) claim. Sherman's section 2000e–3(a) claim was tried to the court and an advisory jury. *See supra* note 4. In such cases, Rule 52(a) requires district courts to "find the facts specially and state separately its conclusions of law thereon."

9. Alternatively, Burke contends that the evidence was insufficient to support the jury's finding of retaliation. This contention is frivolous; the record reveals ample evidence of retaliation.

10. Burke also contends that the district court erroneously instructed the jury on Sherman's section 2000e–2(a)(1) claim for reinstatement of his job with Burke, back pay, and damages. The court instructed the jury, as special interrogatory one indicates, that in order to recover, Sherman had to prove that race was "a substantial motivating factor" in Burke's decision to terminate his employment. Burke objected to the instruction—on the ground that it misstated the law—before the jury retired, as required by Fed.R.Civ.P. 51, thus preserving the objection for appellate review. We do not review the objection, however, because any error that might have occurred was harmless: Burke prevailed on this particular claim.

taliation against an employee who has filed an EEOC complaint constitutes discrimination within the meaning of the statute. Although Burke concedes as much, it points out that section 2000e–3(a) only prohibits an employer from discriminating "against any of *his employees*." Burke therefore argues that liability under section 2000e–3(a) requires the existence of an employer-employee relationship between the parties at the time of the retaliation. In this case, no such relationship existed between Burke and Sherman when Burke persuaded Palmer to fire Sherman. Accordingly, Burke argues that the district court should have dismissed Sherman's section 2000e–3(a) claim.

We recently rejected a similar argument in *Bailey v. USX Corp.*, 850 F.2d 1506 (11th Cir.1988). In that case, an employer had made a negative recommendation to a former employee's prospective employer in retaliation for an EEOC complaint made by that employee. Reasoning that a "strict and narrow interpretation of the word 'employee' to exclude former employees would undercut the obvious remedial purposes of Title VII," *see id.* at 1509–10, we held that a former employee may sue a former employer for retaliation under section 2000e–3(a).

We recognize that the facts in the instant case are not identical to those in *Bailey*. In *Bailey*, the former employee could not obtain other employment because his former employer had "blacklisted" him. Here, Sherman had already obtained new employment when the act of retaliation occurred. In our view, however, the distinction between a blacklisting that prevents a former employee from obtaining a new job and similar conduct that causes him to lose a new job is meaningless. In accordance with our holding that "former employees may sue for retaliation under Title VII," *id.*, we conclude that section 2000e–3(a) proscribed Burke's retaliatory conduct in this case.

### B.

To prove that Burke caused Palmer to fire him, Sherman introduced into evidence a tape recording of a conversation he had with Wade Palmer, the owner of Palmer Construction, a few weeks after he left Palmer's employ. In that conversation, which Sherman recorded without Wade Palmer's knowledge, Wade Palmer stated that William Burke had urged him to fire Sherman for complaining about Burke to the EEOC.[11]

Burke contends that the district court erred in permitting the recording to come before the jury because the recording was inaudible and its contents were hearsay. We find no error.

The controversy concerning the admissibility of the recording arose during Sherman's case-in-chief[12] when his attorney called Wade Palmer to the witness stand and asked him if William Burke had spoken to him about Sherman at any time during Sherman's employment with Palmer Construction. Counsel hoped that Palmer would say that a conversation had taken place and that William Burke had urged

---

**11.** The tape recording contains the following exchange:

Sherman: "Alright sir, Mr. Wade you know when you were telling me about [how] Mr. Bill and Mr. John told you not to work me. [pause] You remember I was working that week with you and you were telling me ..."

Palmer: "Un, un, that ain't what I told you they didn't tell me not to work you. They said if they was me, they wouldn't work you, you turning it around. They can't tell me who to work and who not to work. They just said if I was you, he sued us and done us like he did, if I was you, I wouldn't.... Like he didn't tell me I couldn't work you, he just told me if it was him and you done sued him like you did, and all, you might turn around and sue me."

**12.** The controversy actually began prior to trial when Burke's counsel moved the court in limine to prevent Sherman from mentioning the tape recording in the jury's presence; counsel argued that the recording's contents were hearsay. The court reserved decision on the matter until trial, at which time Burke could renew his objection. As the text indicates, *infra,* after the court admitted the tape recording for purposes of impeachment, Burke objected on the ground that the recording was inaudible. Under the circumstances, we do not consider the motion in limine; rather, we review the objection made at trial and the court's ruling thereon.

him to fire Sherman for complaining to the EEOC; this testimony would have been admissible as nonhearsay under Fed.R. Evid. 801(d)(2) (admission by party-opponent). When Palmer responded that there had been no such conversation, Sherman's attorney approached the bench and asked to discuss a matter out of the jury's presence. After the jury had been excused, counsel informed the court that Palmer had told Sherman that such a conversation had, in fact, taken place; that Sherman had surreptitiously recorded Palmer's statement to this effect; and that counsel wished to impeach Palmer by playing the recording before the jury.

The court concluded that the recording might be admissible as impeachment evidence and suggested that the proper course would be for counsel to call Sherman to the stand, in the jury's absence, and have him identify the recording. *See generally* Fed. R.Evid. 901. If Sherman identified it, he could then recall Palmer to the stand and confront him with the recording. Defense counsel made no objection to this procedure. Accordingly, with the jury still out, Sherman took the stand and identified the recording as the one he had made of his conversation with Wade Palmer a few weeks after the company had fired him.[13]

At this point, Sherman's counsel argued that a sufficient predicate had been laid to introduce the recording into evidence for purposes of impeaching Palmer's statement that William Burke had not spoken to him about Sherman. Defense counsel objected, however, on the ground that portions of the recording were inaudible. The court found that the recording adequately revealed the relevant portion of the conversation between Sherman and Palmer and therefore overruled counsel's objection. The defense raised no objection on hearsay grounds; nor did counsel request a limiting

instruction to inform the jury that the recording was admitted solely to impeach Palmer's testimony. The trial then resumed, with Sherman taking the stand and identifying the tape recording. The court admitted the recording into evidence and played it before the jury without any limiting instruction.

■ Burke now argues that the court erred for two reasons in admitting the recording into evidence. It first claims that the recording is inaudible and therefore lacks probative value. We have listened to the recording and agree with the district court that the relevant portion is audible and probative. Accordingly, we find no error on this point. *See United States v. Sutherland*, 656 F.2d 1181, 1200 (5th Cir. Unit A Sept.1981) ("Recordings must be excluded only if the inaudible or unintelligible portions 'are so substantial as to render the recording as a whole untrustworthy,' and that determination 'is left to the sound discretion of the trial judge.'" (quoting *United States v. Mendoza*, 574 F.2d 1373, 1378 (5th Cir.), *cert. denied*, 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978))), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982).[14]

■ Burke's second claim is that the recording was hearsay. We agree, as did the district court, which admitted the recording only for impeachment purposes. *See generally* Fed.R.Evid. 801(c). The court, however, gave no limiting instruction, and the defense failed to raise any objection on that point. In effect, then, the recording was received for the truth of its contents, and Sherman's counsel used it for that purpose—without any objection from the defense—in his closing argument to the jury. We believe that had defense counsel requested a limiting instruction, the court would have given one, having already recognized that the recording's sole value was

---

**13.** Sherman testified that he had recorded his conversation with Palmer on a miniature tape recorder that his attorney had given him. He described how he had kept the recorder partially concealed in his pocket as he spoke with Palmer. He then identified his own voice and that of Palmer's. Finally, Sherman said that he had recorded the full and complete conversa-

tion between them and that the tape recording accurately reflected what had been said.

**14.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

as impeachment evidence. Burke now asks us to hold that its attorney had no duty to request a limiting instruction but that the court had a duty to give such an instruction on its own initiative. We refuse to so hold.

The relevant rule of evidence, Fed.R. Evid. 105, provides: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, *upon request*, shall restrict the evidence to its proper scope and instruct the jury accordingly." (Emphasis added.) Under this rule, the court had a duty to instruct only "upon request." Since the court had no duty to give a limiting instruction in the absence of a request, we may reverse only if we conclude that the court's failure to give the instruction constituted plain error. *See United States v. Garcia*, 530 F.2d 650, 656 (5th Cir.1976).

We have found no civil case in which a federal appellate court has labelled as plain error a trial judge's failure to give a limiting instruction with respect to evidence that is admissible for some purpose.[15] Indeed, we have uncovered only a single case even addressing the issue. In that case, *Herndon v. Seven Bar Flying Serv., Inc.*, 716 F.2d 1322 (10th Cir.1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984), the appellant argued that plain error occurred when a trial judge failed *sua sponte* to instruct a jury that evidence of subsequent remedial measures was not admissible to prove negligence. The Tenth Circuit recognized that such an instruction would have been appropriate if requested but held that, without such a request, reversal would be improper unless the trial court's failure to instruct constituted plain error. *Id.* at 1330. The court then concluded that the absence of an instruction in that case did not constitute plain error because it resulted in no manifest "miscarriage of justice." *Id.; cf. Wilson v. Attaway*, 757 F.2d 1227, 1242–43 (11th Cir.1985) (finding no plain error in trial judge's failure *sua sponte* to exclude relevant evi-

dence on ground that danger of unfair prejudice outweighed probative value based on his holding that admission resulted in no manifest "miscarriage of justice"). Lawyers frequently choose for strategic reasons not to request limiting instructions. In order to find plain error in this context, therefore, a court must conclude that, as a matter of law, counsel's strategic choice resulted in a manifest miscarriage of justice. We cannot reach such a conclusion here. We therefore find no plain error in the trial court's decision to admit the tape-recorded statement for its nonhearsay purpose without a cautionary instruction.

### C.

Having disposed of Burke's claims, we now consider the effect of *Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), on our decision in this case.

### 1.

 Subsequent to the oral argument in this case, the Supreme Court decided *Patterson*, which significantly narrowed the reach of 42 U.S.C. § 1981 (1982) in the context of employment discrimination suits. In that case, the Court held that section 1981 "covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process." —— U.S. at ——, 109 S.Ct. at 2374. Specifically, the Court concluded that suits based on post-contractual events cannot be brought under section 1981; rather, they must be brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) (1982). *Patterson*, —— U.S. at ——, 109 S.Ct. at 2374–75.

Although *Patterson* involved a racial harassment claim, the Court's analysis compels the conclusion that Title VII's anti-retaliation provision, 42 U.S.C. § 2000e–3(a), provides an exclusive remedy

---

**15.** Appellants concede that the challenged evidence was admissible to impeach the credibility of relevant testimony: whether Palmer had talked with William Burke about Sherman

while Sherman was an employee of Palmer Construction was pertinent to the merits of Sherman's case against Burke.

for the act of retaliation alleged in this case. In disposing of Patterson's harassment claim, the Court stated:

> Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts.... [T]he right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract has been established....

— U.S. at ——, 109 S.Ct. at 2372–73. Here, the retaliatory conduct occurred after Sherman had entered into a contractual relationship with Burke. In fact, that relationship had been terminated.[16] Therefore, Sherman has no cause of action under section 1981.

▮ Nor can Sherman claim that Burke violated section 1981's second guarantee— "the same right ... to ... enforce contracts ... as is enjoyed by white citizens," 42 U.S.C. § 1981. The Court in *Patterson* explained that "[t]he right to enforce contracts does not ... extend beyond conduct by an employer which impairs an employee's ability to enforce through legal process his or her established contract rights." — U.S. at ——, 109 S.Ct. at 2373. Thus, an employer's retaliatory conduct falls under section 1981 only when the employer aims to prevent or discourage an employee from using legal process to enforce a specific contract right. Section 1981 does not apply when an employer retaliates against an employee who has brought a suit alleging post-contractual discrimination that is unrelated to specific contract rights. In the case before us, Sherman alleges that Burke retaliated against him for filing an EEOC complaint. Sherman's EEOC complaint, however, did not relate to any right

created by his employment contract with Burke. Thus, in accordance with the Supreme Court's mandate in *Patterson*, we hold that Sherman has no cause of action under section 1981.[17]

▮ When a trial court has granted a party relief under a statute that provides the party no relief, we must set the court's judgment aside as plain error. *See, e.g., Dunn v. Blue Ridge Tel. Co.*, 868 F.2d 1578, 1581–82, *reh'g granted and op. vacated*, 888 F.2d 731, *reh'g en banc*, 888 F.2d 731 (11th Cir.1989) (vacating district court judgment because case settled). We therefore set aside the portion of the district court's judgment granting Sherman relief under section 1981.

2.

▮ Having concluded that Sherman cannot recover under section 1981 for Burke's retaliatory conduct, we now consider whether Sherman's punitive damages award is sustainable under 42 U.S.C. § 2000e–3(a) (1982). Unlike section 1981, which allows for punitive as well as compensatory damages, *see Johnson v. Railway Express Agency*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975), Title VII limits a plaintiff to "equitable monetary relief" such as lost wages and work benefits, *see Walker v. Ford Motor Co.*, 684 F.2d 1355, 1364 & n. 16 (11th Cir.1982). We therefore hold that Sherman is not entitled to punitive damages for his Title VII retaliation claim and, accordingly, vacate the $12,500 award of punitive damages entered against Burke.

▮ We do not, however, vacate the $10,000 award of compensatory damages. The record reflects that this sum represents the amount of wages Sherman would

---

**16.** Nor can Sherman argue that Burke's actions occurred at the initial formation of his contract with Palmer; Sherman had already obtained that employment at the time of Burke's retaliatory conduct.

**17.** We recognize that other courts have previously held that section 1981's proscription against racial discrimination in the making and enforcement of contracts applies to claims of retaliation for filing an EEOC charge. *See, e.g.,*

*Goff v. Continental Oil Co.*, 678 F.2d 593, 598 (5th Cir.1982). Although the Supreme Court has never directly ruled on the issue, *see Novack Inv. Co. v. Setser*, 454 U.S. 1064, 1065 n. 1, 102 S.Ct. 615, 616 n. 1, 70 L.Ed.2d 601 (1981) (White, J., joined by Brennan and Marshall, JJ., dissenting from Court's denial of certiorari), we believe that the Court's analysis in *Patterson* controls our decision in this case.

have earned if he had continued to work for Palmer from the time he was fired until the time of trial. In accordance with those cases, cited with approval in *Bailey*, 850 F.2d at 1509, that recognize the appropriateness of monetary damages for blacklisting claims brought under section 2000e–3(a), *see Pantchenko v. C.B. Dolge Co.*, 581 F.2d 1052 (2d Cir.1978) (reversing summary judgment for employer in section 2000e–3(a) "blacklisting" case seeking $50,000 in damages); *Rutherford v. American Bank of Commerce*, 565 F.2d 1162 (10th Cir.1977) (upholding award of $2450 in damages in section 2000e–3(a) case involving post-employment blacklisting), we hold that Sherman is entitled to this relief.

### III.

For the foregoing reasons, we affirm the award of $10,000 in compensatory damages under 42 U.S.C. § 2000e–3(a) (1982) but vacate the award of $12,500 in punitive damages under section 2000e–3(a). We reverse the judgment in favor of Sherman under 42 U.S.C. § 1981 (1982) and direct the district court to enter judgment for Burke.

AFFIRMED in part, REVERSED in part, and VACATED in part.

TJOFLAT, Chief Judge, specially concurring in which ATKINS, Senior District Judge, joins:

I concur in the court's disposition because I believe it to be mandated by *Bailey v. USX Corp.*, 850 F.2d 1506 (11th Cir. 1988). I write separately because I am convinced that *Bailey* and the cases it relied upon for the result it reached were wrongly decided. If this panel were not constrained by previous decisions of our court, *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (prior decisions of Eleventh Circuit, panel or en banc, cannot be "overruled by a panel but only by the court sitting en banc"), I would hold that the anti-retaliation provision of Title VII of the Civil Rights Act of 1964, § 704, 42 U.S.C. § 2000e–3(a) (1982), does not proscribe the retaliatory conduct alleged in this case and that it is inappro-

priate to imply a cause of action for money damages in a Title VII case.

I divide this special concurrence into two parts. The first examines Title VII's purposes and its remedial scheme and demonstrates that Title VII's anti-retaliation provision, section 2000e–3(a), was not intended to grant a cause of action for money damages against employers who, after termination of the employment relationship, engage in retaliatory blacklisting or adverse comment against their former employees. In part II, I argue that the *Bailey* panel's creation of an implied cause of action for damages in Title VII cases was based on an inadequate inquiry into whether Congress intended to create such a remedy.

### I.

The purposes of Title VII are (1) to enhance the opportunity of minorities to "be hired on the basis of merit," *see* 110 Cong. Rec. 6549 (1964) (remarks of Senator Humphrey introducing Civil Rights Bill in Senate), and (2) to "eliminate ... discrimination in employment based on race, color, religion, or national origin," H.R.Rep. No. 914, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code Cong. & Admin.News 2355, 2391, 2401; *see* H.R.Rep. No. 238, 92d Cong., 2d Sess., *reprinted in* 1972 U.S. Code Cong. & Admin.News 2137, 2141 (adding gender as one of the bases upon which an employer is forbidden to discriminate); *see also Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). "Cooperation and voluntary compliance were selected as the preferred means of achieving th[ese] goal[s]." *Gardner–Denver*, 415 U.S. at 44, 94 S.Ct. at 1017. To this end, Congress created the Equal Employment Opportunity Commission (EEOC) to entertain the grievances of employees and job applicants. *Id.* The EEOC's function is to settle disputes through conference, conciliation, and persuasion rather than to adjudicate claims or impose administrative sanctions, because conciliation promotes greater harmony in the workplace. *See* H.R.Rep. No. 238, *supra, reprinted in* 1972 U.S.Code Cong. & Admin.News at 2144.

In the event that conciliation fails, the EEOC or an individual grievant can turn to the courts for equitable remedies. Title 42 U.S.C. § 2000e–5(g) provides, in pertinent part:

> If the court finds that the [employer] has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the [employer] from engaging in such unlawful employment practice, and order ... reinstatement or hiring of employees, with or without back pay ... or any other *equitable* relief as the court deems appropriate.

(Emphasis added); *see also* H.R.Rep. No. 914, *supra, reprinted in* 1964 U.S.Code Cong. & Admin.News at 2405. Congress thus gave the courts the power (1) to restore an unlawfully terminated employee to his job with back pay, (2) to promote an employee who is unlawfully denied a chance to get ahead and to award back pay at the higher grade, and (3) to require an employer to hire a job applicant who has been unlawfully denied a position and to award the applicant back pay. *See id., reprinted in* 1964 U.S.Code Cong. & Admin.News at 2405, 2415–16.

Indeed, Congress did not authorize the courts to grant *legal* remedies (compensatory and punitive damages) because such relief could not achieve the congressional purposes behind Title VII. *See Van Hoomissen v. Xerox Corp.,* 368 F.Supp. 829, 837 (N.D.Cal.1973) (Congress intended Title VII as tool for ensuring equal opportunity in employment not as device for punishing those who frustrate that goal). Congress intended that, with discrimination eliminated from the workplace, all persons seeking work would have equal opportunity to find jobs and, once hired, to enjoy the attendant salary, security, and opportunity for advancement. Consistent with the goal of creating an accessible and secure workplace, the congressionally enacted remedies contemplate an ongoing employment relationship between the disputants. An award of back pay, although taking the form of monetary relief, is intertwined with equitable remedies designed to perpetuate or create the employment relationship. *See Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122, 1125 (5th Cir.1969) ("The demand for back pay is not in the nature of a claim for damages, but rather is an integral part of the statutory equitable remedy...."). Although an award of money damages would undeniably relieve economic loss already suffered by a Title VII grievant,[1] money damages could not restore a wrongfully discharged employee to his job; it could not obtain for a deserving employee the promotion, prestige, and privileges he seeks; and finally, it could not obtain for a discriminated-against applicant the job, continuing wages, and security he desires.

When enacting Title VII, Congress recognized that where aggrieved persons must file charges or otherwise participate in Title VII actions against current or prospective employers in order to obtain a remedy, employers can put enormous pressure on those persons in order to dissuade them from taking the necessary action. For this reason, Congress included in Title VII an anti-retaliation provision to ensure that employees and job applicants "cannot be penalized for resorting to the legal procedures that Congress has established in order to right congressionally recognized wrongs." *East v. Romine, Inc.,* 518 F.2d 332, 340 (5th Cir.1975), *overruled on other grounds sub nom., Burdine v. Texas Dep't. of Community Affairs,* 647 F.2d 513, 514 & n. 4 (5th Cir. May 1981). That provision is contained in section 2000e–3(a), which provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because [the employee or applicant] has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

---

1. When a job applicant or employee prevails in a Title VII action and is hired or reinstated, that person suffers no future economic loss; her earning capacity is restored along with her job.

The sort of discrimination contemplated by section 2000e–3(a) is obvious: because a job applicant or employee has engaged in protected conduct, the employer refuses to hire the applicant or to promote the employee, or cuts the employee's wages, fires him, or makes working conditions so intolerable for him that a "constructive discharge" occurs. In each of these cases, the current or prospective employer has control over the conditions of the workplace and is in a position to correct the acts of discrimination. A court of equity can remedy the discriminatory conduct by issuing coercive orders, enforceable through the court's civil contempt power, requiring the employer to restore the employee to the *status quo ante* and to prevent recurrence of the discrimination, while preserving (or creating) the employment relationship. A court of law, however, is powerless to help the retaliated-against job applicant or employee other than by putting money in his pocket.

Moreover, although courts can make reasonable approximations when awarding back pay, they cannot possibly assess future damages—those beyond the date of trial—with reasonable certainty. The employment relationship's continued success or its termination due to lawful causes is highly speculative, especially in the case of the job applicant, where there is no employment history whatsoever. A trier of fact cannot know how long the grievant would have stayed on the job or what raises, bonuses, commissions, etc., he might have earned had he been hired or retained. Although there is also no employment history when a wrongfully rejected job applicant brings a Title VII action against a prospective employer, the problem of assessing future damages does not arise under the

equitable remedial scheme provided by Congress for job applicants and employees alike. The job applicant can obtain equitable relief that puts him on the job and entitles him to future benefits for as long as he remains employed; no trier of fact must attempt to identify what those benefits would have been. This Title VII remedy is equally available to the person whose former employer has "blacklisted" him and who cannot find a job as a result: he seeks equitable relief, as a *job applicant*, against the *prospective employer* who has refused to hire him because of his participation in Title VII activity, not against the former employer. It is only the prospective employer who is in a position to make the "blacklisted" applicant whole in the sense contemplated by Congress—by providing him a job and the attendant status, security, and salary (plus back pay) for as long as he remains on the job.[2]

The foregoing illustrates both why Congress envisioned only equitable relief and why Congress gave a cause of action only to current employees and job applicants. *See* 42 U.S.C. § 2000e–3(a) (prohibiting an employer from retaliating "against any of *his* employees or applicants for employment") (emphasis added); *id.* § 2000e(f) (defining "employee," for the purposes of Title VII, as "an individual employed by an employer"). Congress, in enacting section 2000e–3(a), was not interested in granting a right of action against someone not in a position to remedy the wrong by offering new or continued employment to the party who has been wrongfully denied *that employment.* Our opinion in *Bailey,* however, creates a damages action for persons *outside* a current (or prospective) employment relationship.[3] Under *Bailey*'s analy-

---

**2.** Significantly, in order to make out a damages claim against the former employer whose blacklisting has prevented the ex-employee from working elsewhere, the ex-employee would have to show that a particular employer would have hired him but for the retaliatory comments concerning his involvement in activity protected by Title VII. This sort of discrimination—based on the employee's protected activity—is precisely what he must show in order to make out a section 2000e–3(a) claim as a job applicant against the prospective employer. Congress for-

esaw this situation and expressly provided a remedy—but against the new employer, not against the former employer.

**3.** Shortly before *Bailey,* a panel of this court endorsed the position of several other courts that Title VII can extend to claims against covered employers who interfere with an individual's employment opportunities with a third party. *Pardazi v. Cullman Medical Center,* 838 F.2d 1155, 1156 (11th Cir.1988) (citing *Lutcher v. Musicians Union Local 47,* 633 F.2d 880, 883 n. 3

sis, when a person's employment is terminated, even in a manner that does not violate Title VII,[4] he obtains by operation of law a potential right of action for damages against his ex-employer.[5] If, at any time after the lawful termination of that employment relationship, the former employer "retaliates" successfully against the ex-employee (i.e., causes other employers not to hire him) because the former employee once exercised Title VII rights (against any employer, past or present), the former employer is liable for money damages. In short, *every* employee who leaves the employment of *any* employer subject to Title VII can sue the previous employer any time that employer "retaliates" against him, although the former employee does not seek re-employment from the ex-employer. All he must show is that the former employer hindered his employment potential and that, as a result, he suffered some economic loss.

## II.

Because Title VII creates no express legal remedy, only a scheme of equitable remedies, a legal remedy can exist only by implication. The *Bailey* panel, departing from our precedent that damages are unavailable under Title VII, *see Walker v. Ford Motor Co.*, 684 F.2d 1355, 1364 (11th Cir.1982), held that an implied cause of action for damages exists against a former employer for violation of section 2000e–3(a), *Bailey*, 850 F.2d at 1509. In my view, the *Bailey* panel implied a cause of action without sufficient inquiry into the decisive issue of congressional intent.

In recent years, the Supreme Court has frequently addressed the question of when courts may appropriately imply rights of action in statutory schemes. As Congress enacted more comprehensive and complex statutes in the 1970's, *see Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 377 n. 59, 102 S.Ct. 1825, 1838 n. 59, 72 L.Ed.2d 182 (1982), the courts' prior practice of implying statutory causes of action somewhat routinely had to be replaced with a more rigorous approach. *Id.* at 377, 102 S.Ct. at 1838–39; *see Liberty Nat'l Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 558 (11th Cir.1984). In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), therefore, the Supreme Court outlined a four-factor test for determining the existence of a statutorily implied cause of action:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted).

(9th Cir.1980); *Sibley Memorial Hosp. v. Wilson*, 488 F.2d 1338, 1340–41 (D.C.Cir.1973)). In *Pardazi*, however, the plaintiff alleged a violation of 42 U.S.C. § 2000e–2(a)(1), which makes it unlawful "to discriminate against any *individual* with respect to his compensation, terms, conditions, or privileges of employment." (Emphasis added.) Without expressing any opinion on the wisdom of extending Title VII coverage to such claims, I note the contrast between the open-ended language of section 2000e–2(a)(1) and the limiting terminology of section 2000e–3(a). *See supra.*

4. Of course, when there has been an "unlawful" termination under Title VII, the employee has

an action in equity against his former employer, as I have explained in the text. *See supra* at 1537.

5. Such a cause of action against a former employer who has fired an employee for legitimate reasons but has blacklisted that employee for filing an EEOC claim cannot be characterized as equitable monetary relief. Because the employee is not entitled to get his job back from the employer, equity can force the employer to do nothing that would make the employee whole; any award of damages against the employer would merely be a garden-variety damage award.

Subsequent Supreme Court opinions have made it clear that the central inquiry under *Cort* is congressional intent, *see Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979), and that all four *Cort* factors are relevant in determining that intent, *see Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536, 104 S.Ct. 831, 838, 78 L.Ed.2d 645 (1984); *Touche Ross*, 442 U.S. at 575–76, 99 S.Ct. at 2489. This court has followed the approach outlined in *Cort* and its progeny. *See, e.g., Liberty Nat'l Ins.*, 734 F.2d at 558. The *Bailey* panel, however, found an implied cause of action for damages without even attempting to determine, under the four-factor test, whether Congress intended to permit suit for damages under Title VII. Had the panel done so, it would no doubt have concluded that the second, third, and fourth factors were not satisfied.

With regard to the second factor identified as relevant by the Supreme Court in *Cort*—legislative intent to create a remedy—I have searched the legislative history of Title VII in vain for any substantial support for *Bailey*'s conclusion that Congress intended the anti-retaliation provision, 42 U.S.C. § 2000e–3(a), to provide a cause of action for money damages. To the contrary, what little can be gleaned from the legislative record points to the opposite conclusion. In explaining and introducing the Civil Rights Bill, Senators Humphrey, Clark, and Case refer to the fact that Title VII's relief provision was modeled on the National Labor Relations Act (NLRA), *see* 29 U.S.C. § 160(c) (1982). *See* 110 Cong.Rec. 6549 (remarks of Senator Humphrey), 7214 (remarks of Senators Clark and Case). The NLRA provision had

been interpreted by the Supreme Court as not allowing punitive or compensatory damages. *See UAW v. Russell*, 356 U.S. 634, 645, 78 S.Ct. 932, 939, 2 L.Ed.2d 1030 (1958); *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 235–36, 59 S.Ct. 206, 219, 83 L.Ed. 126 (1938). " '[T]he similarity of the two statutes and the fact that Congress was aware that neither punitive nor compensatory damages were allowed under the National Labor Relations Act leads to the firm belief that Congress did not intend that any money damages ... would be granted under [Title VII].' " *Harrington v. Vandalia–Butler Bd. of Educ.*, 585 F.2d 192, 197 (6th Cir.1978) (quoting *Van Hoomissen v. Xerox Corp.*, 368 F.Supp. 829, 837 (N.D.Cal.1973)), *cert. denied*, 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979).[6]

Furthermore, Congress' inclusion in Title VII of a specific, well-defined remedial scheme weighs strongly against implying an additional scheme to effectuate legislative intent. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14–15, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate."); *Transamerica Mortgage Advisors*, 444 U.S. at 20–21, 100 S.Ct. at 247 ("[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.").

Without citing any legislative materials, the *Bailey* panel asserted that a cause of action for damages against employers who "blacklist" their former employees is warranted because "a strict and narrow interpretation of the word 'employee' to exclude former employees would undercut the obvi-

---

**6.** In addition to the dearth of support in the legislative history for *Bailey*'s holding, the language of section 2000e–3(a) itself plainly militates against interpreting the statute to provide any implied cause of action in such cases as the one before the *Bailey* court and the one before us now, i.e., suits against employers who have engaged in retaliatory blacklisting of their former employees. The statute provides that it shall be unlawful for an employer to retaliate

against "any of his employees or applicants for employment." That Congress specifically referred to "applicants for employment" in addition to "employees" makes it unlikely that Congress intended the term "employee" to be interpreted broadly to cover former employees; if Congress wished the statute to reach former employees, it could have simply used words to that effect, as it did with respect to job applicants.

ous remedial purposes of Title VII." [7] 850 F.2d at 1509. Title VII, however, specifically provides a remedy for the ex-employee who has been subject to the deplorable practice of employer blacklisting. If the former employer's retaliatory comments about the employee's exercise of Title VII rights cause injury to the employee, it is because other employers refuse to hire him. The former employee, *as a job applicant*, has a Title VII remedy for his injury against these other employers: in making it unlawful for an employer to discriminate against an applicant for employment because that person "has made a charge, testified, assisted, or participated in any manner in an [EEOC] investigation, proceeding, or hearing," *see* 42 U.S.C. § 2000e–3(a), Congress did not limit the statute's reach to the employer against whom such a charge was levied; rather, the statute also covers those who reject a job applicant because he has complained to the EEOC about a third party. Therefore, the courts do not need to imply a new cause of action in order to provide the applicant with a remedy: an individual who cannot find work because of retaliatory blacklisting brought about by a former employer can obtain relief, under Title VII's express provisions, from those employers who have rejected his job application based on his involvement in an EEOC matter. In sum, Title VII already gives the grievant the relief he wants—the new job with all its attendant benefits, plus an award of back pay to remedy his past economic loss.

Turning to the third of *Cort*'s four factors, the question is whether a cause of action in money damages is "consistent with the underlying purposes of the legislative scheme." 422 U.S. at 78, 95 S.Ct. at 2088. My earlier discussion explains why such a cause of action is not at all consistent either with Title VII's remedial scheme or with its substantive purposes. As I note above, Congress' goal in enacting Title VII was not to punish recalcitrant employers but to ensure equal opportunity in employment and a discrimination-free workplace. Congress did not grant the courts power to award legal remedies because only equitable relief in the form of a coercive order against a current or prospective employer could make the wronged employee or job applicant whole in the sense of guaranteeing ongoing employment in a discrimination-free workplace. When, in addition, compensation for the economic loss suffered by a wronged employee or job applicant is necessary to make the aggrieved party whole, compensation is available in the form of back pay, expressly designed by Congress as a complement to the statutory equitable remedies, awarded in the same coercive order.

As for the final *Cort* factor, a remedy at law for retaliatory blacklisting need not be implied because the common law already provides a remedy. States (including the parties' own state, Georgia), have long recognized the tort of malicious and intentional interference with contract. *See, e.g., Luke v. Du Pree*, 158 Ga. 590, 124 S.E. 13, 16 (1924) ("[A]n injury [to a property right created by contract] amounts to a tort for which the injured party may seek compensation by an action in tort for damages.... [T]he term 'malicious' or 'maliciously' means any unauthorized interference, or any interference without legal justification or excuse."). *See generally* Restatement (Second) of Torts § 766 (1979). Under this general principle, malicious, intentional interference with an employment relationship is actionable. *See, e.g., Nager v. Lad'n Dad Slacks*, 148 Ga.App. 401, 251 S.E.2d 330, 333 (1978). If the ex-employer "retaliates" against his former employee by commenting adversely on the employee's pro-

---

7. In support of its interpretation, the *Bailey* court cites cases construing the anti-retaliation provisions of the Age Discrimination in Employment Act (ADEA) and the Fair Labor Standards Act (FLSA). *Bailey*, 850 F.2d at 1509 (citing *EEOC v. Cosmair, Inc.*, 821 F.2d 1085 (5th Cir. 1987), and *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139 (6th Cir.1977)). These cases, however, are inapposite. In contrast to Title VII, which expressly limits the relief available under the statute to equitable relief, *see* 42 U.S.C. § 2000e–5(g), both the FLSA and the ADEA provide that any employer who violates their anti-retaliation provisions shall be liable for such "*legal* or equitable relief" as may be appropriate, *see* 29 U.S.C. §§ 216(b) (penalties for violating FLSA), 627(c)(1) (judicial relief under ADEA) (emphasis added).

tected conduct—implying, for instance, that the former employee was a troublemaker—and if the comment causes a new employer to fire the employee, then the employee would have the same state law cause of action against the first employer as he would have against any third party who "maliciously and intentionally" interfered with his new employment.[8]

Similarly, the common law recognizes the tort of interference with prospective economic advantage. *See* Restatement (Second) of Torts § 766B (1979). According to the Restatement (Second) § 766B:

> One who intentionally and improperly interferes with another's prospective contractual relation ... is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, [where] the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation....

Thus, if a job applicant can show that a prospective employer would probably have hired him but for his former employer's hostile retaliatory comments about his Title VII activity, the rejected applicant has a common law cause of action against the former employer.

### III.

I conclude that section 2000e–3(a), properly analyzed, implies no cause of action for money damages, nor does it grant any cause of action to an ex-employee against a former employer who retaliates against the ex-employee after the legitimate termination of their employment relationship. Congress specifically provided a comprehensive scheme of equitable, not legal, remedies designed to promote ongoing employment in a discrimination-free workplace.

Burke, the former employer in this case, having lawfully terminated Sherman's employment, was placed in the same position as a third party who had never had an employment relationship with Sherman. Title VII does not prevent such parties from voicing their opinions about a person's participation in an EEOC action. If, in so doing, Burke causes Sherman to lose work with another employer, then Sherman still has his common law remedies against Burke as well as his Title VII remedies against the new employer. Being bound, however, to follow our circuit precedent, I must concur in the court's disposition.

---

**8.** Although the law is less settled when the employment contract is terminable at will, there is considerable authority to the effect that malicious and intentional interference with employment relationships is nonetheless actionable. *See, e.g., Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 710 P.2d 1025, 1041–42 (1985); *Nager v. Lad'n Dad Slacks,* 148 Ga.App. 401, 251 S.E.2d 330, 333 (1978); *see also Roseman v. Hassler,* 382 F.Supp. 1328, 1340–41 (W.D.

Pa.1974) (applying Pennsylvania law), *aff'd sub nom., Roseman v. Indiana University,* 520 F.2d 1364 (3d Cir.1975), *cert. denied,* 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976); *cf. Truax v. Raich,* 239 U.S. 33, 39, 36 S.Ct. 7, 9, 60 L.Ed. 131 (1915) ("The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others."). *See generally* Restatement (Second) of Torts § 766 comment g.