**Hassan M. AL–HASHIMI, Plaintiff,**

v.

**Dr. Julius S. SCOTT, Jr., The Board of Trustees of Paine College, individually and in their official capacities; Dr. Daniel A. Collins, Chair of the Board of Trustees of Paine College, Defendants.**

**No. CV 190–014.**

United States District Court,
S.D. Georgia,
Augusta Division.

Jan. 31, 1991.

John P. Batson, Augusta, Ga., for plaintiff.

William C. Reed, Mark C. Wilby, Fulcher, Hagler, Reed, Obenshain, Hanks & Harper, Augusta, Ga., for defendants.

## ORDER

EDENFIELD, Chief Judge.

The plaintiff, Hassan M. Al–Hashimi ("Al–Hashimi"), complains that the defendants discriminated against him because of his race, age, and national origin in violation of 42 U.S.C. § 1981 (1988), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1988), and the Age Discrimination in Employment Act of 1967, ("ADEA") 81 Stat. 602 (1967), 29 U.S.C. §§ 621–34 (1988). He is also suing for breach of contract.[1]

The defendant, Dr. Julius S. Scott, Jr. ("Scott"), has moved for summary judgment on the section 1981, Title VII and ADEA claims.[2] He has not moved for summary judgment on the breach of contract claim. For the reasons developed below, the Court GRANTS the defendant's motion for summary judgment based on section 1981, Title VII, and the ADEA. Although the other defendants, the Board of Trustees of Paine College and its Chair, did not join in the motion for summary judgment, the rationale for granting Scott's motion applies equally to them. Therefore, the Court grants summary judgment for all defendants on the plaintiff's section 1981, ADEA, and Title VII claims. The plaintiff's other claim is for breach of contract—a state law claim. Because there is no independent jurisdiction for this claim, the Court DISMISSES this claim without prejudice to the plaintiff's right to bring this claim in state court.

## BACKGROUND [3]

The plaintiff, Hassan Mohammed Al–Hashimi, was born on June 22, 1922, in Baghdad, Iraq. From January 29, 1963, to May 1989, he worked as an instructor and an assistant professor at Paine College in Augusta, Georgia. For twenty-two years of his employment, Al–Hashimi was a tenured faculty member whose salary was negotiated yearly.

The defendant Julius S. Scott, Jr. became president of Paine College in August 1988. In the academic year 1988–1989, Scott implemented what he called a "full court press" initiative. The initiative was designed to improve the quality of instruction and education at Paine, and to renew the commitment of the staff to that purpose.

On February 20, 1989, Scott sent Al–Hashimi a letter informing him that the "full court press" had prompted reviews of

---

1. The plaintiff recently has moved the Court for dismissal of the breach of contract claim. The Court grants this motion. The complaint also originally contained a claim for slander, libel, and defamation. The plaintiff, however, has dismissed this claim as well.

2. Quite often, both parties refer to the age discrimination claims as claims under Title VII.

Of course, Title VII does not prohibit age discrimination, but the ADEA does. The Court will interpret references to age discrimination under Title VII as references to the ADEA.

3. Unless otherwise noted, the facts summarized in this section are uncontroverted.

faculty performance, and that reviews of Al–Hashimi's performance had revealed serious deficiencies: "[Y]ou have not kept pace with the common syllabus,[4] have not prepared well for classes, and ... you have been absent from class an inordinate number of times over several semesters." The letter continued, "if your performance does not improve significantly and immediately, you will not be reappointed as a member of the faculty.... If there is no significant change, there will be no alternative to your dismissal for cause." Copies of this letter were sent to Dean Roger Williams, Dean of Academic Affairs; Dr. Leslie K. Pollard, the chair of the social sciences division; and Dr. Albert Kitchen, the coordinator of the history department.

Al–Hashimi has submitted as an exhibit a letter he wrote to Dean Williams on February 26, 1989, asking for clarification of the notice he had received by the letter of February 20, 1989. He indicated: "I have requested several times that my evaluation be made by independent, professionally trained evaluators brought from outside of the college. I am willing to pay whatever expense is involved." The plaintiff met with Dean Williams and Scott on March 15, 1989, and perhaps on other days during this period.

Scott indicates that he met with Al–Hashimi several times after Scott's letter of February 20th to discuss his progress. Although he does not specifically recall, Scott admits that he may have referred to Al–Hashimi's accent in a discussion of students' difficulties in understanding the plaintiff. Al–Hashimi recalls a more direct reference. In his deposition, Al–Hashimi was asked how his age came up in conversation with Scott. He replied:

That's the first thing he said to me. "Mr. Al–Hashimi, you are 60–some–years old, and you are from the Middle East. You talk differently from the other," or words something to that effect, indicat-

ing that the students have a problem trying to understand my accent.[5]

Scott denies making these statements.

Scott claims that the college reviewed the classroom performance of all faculty, including Al–Hashimi, during the spring semester of 1989. A letter from Kitchen to Scott, written on March 28, 1989, and submitted to the Court by the plaintiff, indicates that Al–Hashimi's course proceeded too slowly and that "[i]t is difficult most times to make the correct connections in his class." Scott swears in his affidavit that he attended one of Al–Hashimi's classes in late spring 1989, and that the "plaintiff was well behind the common syllabus, did not appear well prepared, and was having difficulty communicating the subject matter he was presenting."

Al–Hashimi claims that no other faculty were evaluated about whether they kept up with a common syllabus, and he believes there was substantial controversy about whether the syllabus was reasonable.[6] It was apparently adapted from a two semester course into the one semester course taught by Al–Hashimi and Kitchen. Indeed, in 1984, Kitchen memorialized a conversation he had with Al–Hashimi about that course. Kitchen acknowledged that teaching the subject in only one semester is "possible only with a great deal of work and preparation on our part.... I shall continue to try to press for a reinstitution of this course on a two-semester basis. Until then we must, professionally and morally, do our best to fulfill our responsibility in this matter." Scott conceded in his deposition that the administration does not evaluate all faculty on adherence to common syllabi. Instead, these evaluations are only done if someone is known to deviate substantially from a course syllabus.

On May 10, 1989, Leslie J. Pollard sent a memorandum to Scott suggesting that Scott inform Al–Hashimi that he would be offered a contract to teach for one more year, but that the contract would not be

4. A "common syllabus" is apparently a syllabus shared by all faculty who teach the class.

5. Deposition of Hassan Al–Hashimi, at 72.

6. Although World History was a one-semester course, the syllabus was apparently adapted from a two-semester course.

renewed. Pollard wrote, "[O]perationalizing incompetence and neglect of duty is no easy task despite the consensus that Mr. Hashimi is probably guilty of some things that fall into these categories. The added difficulty, it seems to me, is whether these misdoings constitute 'cause' in a legal sense."

On May 12, 1989, Scott sent Al-Hashimi a letter notifying him, "You still have not kept pace with a common syllabus, and your preparation and performance have not improved significantly." The letter indicated the college's intention to terminate Al-Hashimi, but to allow him to teach part-time during the following year. The salary offered was $8,737.50. Mr. Al-Hashimi's affidavit indicates that his former salary was slightly over $17,000. Scott did not offer Al-Hashimi a hearing on the matter, nor did Al-Hashimi request one. No hearing was conducted.

Attached to the letter was a formal offer of the part-time appointment. This attachment contained a signature line for Al-Hashimi to sign, indicating his acceptance of the offer. The letter requested the signature by May 22, 1989. Al-Hashimi did not sign the contract, however.

On July 12, 1989, Scott sent Al-Hashimi another letter informing him: "Inasmuch as you have failed to return the contract, I have no alternative but to negate it and authorize the Dean for Academic Affairs to seek someone to teach the load assigned to you." Scott indicates that the college did not hire a new teacher to replace Al-Hashimi, but reassigned Al-Hashimi's teaching load to Dr. Claudia Jones, a black female, and Dr. Albert Kitchen, a white male.

According to the defendants, five other faculty members received letters similar to the one Al-Hashimi received on February 20, 1989. Three of those professors, Dr. J.C. Taylor, a black male, Dr. Don F. Gonella, a white male, and Dr. A. Ali Syed, an Indian male, continue working at the college. The defendants maintain that these three men responded to the letters by improving their performances. Two black, non-tenured employees received similar letters and were terminated at the end of the

academic year. Scott states that these two teachers were fired because they did not improve their performance.

The plaintiff filed a complaint with the Equal Employment Opportunities Commission ("EEOC") more than 180 days before he filed this lawsuit. He received a right to sue letter from the EEOC on November 20, 1989. He filed this action on January 19, 1990.

## ANALYSIS

### I. Standards for Summary Judgment

"[T]he purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Fed'n,* —— U.S. ——, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *E.g., Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510; *DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1505 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir.1990). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out . . .—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554.

It is then the nonmovant's burden to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987). The nonmovant must do this by "coming forward with sufficient evidence on each element that must be proved." *E.g., Kee v. National Reserve Life Ins. Co.*, 918 F.2d 1538, 1543 (11th Cir.1990) (quoting *Earley*, 907 F.2d at 1080). The nonmovant must point to specific facts which contradict essential facts shown by the movant. *Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir.1990).

In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *E.g., Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir.1990); *Earley*, 907 F.2d at 1980; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir.1990). The evidence need not be in a form that would be admissible at trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir.1988). "Where the record, taken as a whole could not lead a rational trier of fact to find for the nonmoving party, then there is no genuine issue for trial." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir.1989). The Court, however, must avoid weighing conflicting evidence, *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2514; *Brown v. Hughes*, 894 F.2d 1533, 1536 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir.1986), or making credibility determinations. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2514; *McKenzie v. Davenport Funeral Home*, 834 F.2d 930, 934 (11th Cir.1987). At bottom, "where the facts specifically averred by [the nonmovant] contradict facts specifically averred by the movant, the motion must be denied." *Lujan*, 110 S.Ct. at 3188 (1990).

## II. Section 1981

■ Al–Hashimi claims that the college violated 42 U.S.C. § 1981 (1988) by effectively terminating him in May 1989. The defendants claim that this letter did not terminate Al–Hashimi, but merely offered to continue his contract for another year with slightly different terms than had been included before. This is a difficult position to defend. Al–Hashimi had tenure with the college; annual contract negotiation never before had included discussions of anything other than salary. The offer of a part-time, one-year contract at half the previous salary was either a notice of termination, or at least a demotion. Neither of these characterizations, however, allow Al–Hashimi to pursue a section 1981 claim. According to *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) and its progeny, section 1981 does not cover this grievance. Moreover, Al–Hashimi appears to allege retaliation and disparate treatment as other violations of section 1981. As explained below, these claims are not covered by section 1981, either.

### A. *Patterson*

Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory *to make and enforce contracts*, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security and persons and property as is enjoyed by white citizens, and shall be subject to like punishment,

pains, penalties, taxes, licenses, and exactions of every kind, and no other.

42 U.S.C. § 1981 (1988) (emphasis added). In *Patterson,* the Supreme Court explained the limitations of section 1981. The Court declared, "Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts." 109 S.Ct. at 2372. Thus, the Court held that racial harassment relating to the conditions of employment is not actionable under section 1981.

The Court explained the rationale behind limiting section 1981 in this manner:

Interpreting § 1981 to cover postformation conduct unrelated to an employee's right to enforce her contract ... is not only inconsistent with that statute's limitation to the making and enforcement of contracts, but would also undermine the detailed and well-crafted procedures for conciliation and resolution of Title VII claims....

Where conduct is covered by both § 1981 and Title VII, the detailed procedures of Title VII are rendered a dead letter, as the plaintiff is free to pursue a claim by bringing the suit under § 1981 without resort to those statutory prerequisites.... We should be reluctant ... to read an earlier statute broadly where the result is to circumvent the detailed remedial scheme constructed in a later statute.... That egregious racial harassment of employees is forbidden by a clearly applicable law (Title VII), moreover, should lessen the temptation for this Court to twist the interpretation of another statute (§ 1981) to cover the same conduct.

*Id.* at 2374–75 (citation omitted).

### B. *Retaliation Claims after Patterson*

A panel of the Eleventh Circuit has determined that, in view of *Patterson,* section 1981 does not proscribe retaliatory conduct. Instead, the court declared, "Title VII's anti-retaliation provision, 42 U.S.C. § 2000e–3(a), provides an exclusive remedy for the act of retaliation alleged in this case." *Sherman v. Burke Contracting,*

*Inc.,* 891 F.2d 1527, 1534–35 (11th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 353, 112 L.Ed.2d 317 (1990). The court recognized that retaliatory conduct that discourages an employee from using the legal process to enforce a contract right would be actionable under section 1981. In this case, however, Al–Hashimi does not claim he was prevented from pursuing his legal rights. Thus, following *Sherman,* Al–Hashimi may not pursue his claim for retaliation under section 1981.

Another panel of the Eleventh Circuit has recently called into question the propriety of the *Sherman* court's decision. In *Kimbrough v. Bowman Transp., Inc.,* 920 F.2d 1578 (11th Cir.1991), the court refused to reach the issue of whether *Patterson* precludes section 1981 claims for retaliatory discharge. It refused to reach this issue because the parties had not raised the issue in the district court. *Id.* at 1582. The court criticized *Sherman* for reaching the issue, and noted, "Because the panel in *Sherman* should never have reached the merits of Burke's scope of section 1981 defense, we note that the panel's conclusion that retaliatory discharge is not cognizable under section 1981 is merely dicta." *Id.*

In this case, the parties have raised the issue of *Patterson* and its effect on retaliation claims under section 1981. Thus, the Court must decide the issue. Following the dicta of *Sherman,* the Court holds that this claim is not cognizable under section 1981. This determination is supported by the analysis of discriminatory discharge and demotion claims outlined below.

### C. *Demotion or Discharge Claims after Patterson*

Section 1981 does not encompass claims for discriminatory discharge or demotion, either. The Supreme Court has not addressed this issue, but the *Patterson* Court has held that some failure to promote claims may be cognizable under section 1981. The Court noted:

the question whether a promotion claim is actionable under § 1981 depends upon

whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under § 1981. In making this determination, a lower court should give a fair and natural reading to the statutory phrase "the same right ... to make ... contracts," and should not strain in an undue manner the language of § 1981.

*Id.* 109 S.Ct. at 2377 (citation omitted).

This exception suggests at first blush that section 1981 covers many claims related to change in status within the employment: promotion, demotion, or termination claims. The answer is not quite so simple. A panel of the Eleventh Circuit, in a recent per curiam opinion, decided that *Patterson* forecloses a claim for discriminatory discharge and retaliation. *Thompkins v. DeKalb County Hosp. Auth.,* 916 F.2d 600, 601 (11th Cir.1990).[7]

After *Thompkins* was decided, the Eleventh Circuit had another opportunity to address the issue, this time en banc. In *McGinnis v. Ingram Equipment Co.,* 918 F.2d 1491 (11th Cir.1990), the plaintiff sued for discriminatory discharge under section 1981. Like the *Kimbrough* court, the *McGinnis* court refused to reach the *Patterson* issue, deciding that failure to raise the issue before the district court waived it. *Id.* at 1497. Inexplicably, the court did not cite *Thompkins* at all. This omission does not indicate that the full court disagreed with *Thompkins,* and this Court is of course bound by panel decisions of the Eleventh Circuit. Nevertheless, the failure of *McGinnis* to cite *Thompkins,* the exist-

ence in *Thompkins* of an alternative holding, and the confusion over post-*Patterson* retaliation claims in this circuit, suggest that *Thompkins* may not be as straightforward as it seems. For this reason, the Court has reviewed the decisions of other circuits for guidance in interpreting these Eleventh Circuit cases. The review has revealed that, as *Thompkins* suggests, section 1981 and *Patterson* preclude suits for discriminatory discharge under section 1981.

Most post-*Patterson* courts that have addressed the issue have concluded that discriminatory termination is not covered by section 1981.[8] Some courts have disagreed with this result, arguing that termination affects the very existence of the employment contract, and thus it impairs the right to make a contract. *E.g., Padilla v. United Air Lines,* 716 F.Supp. 485, 490 (D.Colo. 1989). Notably, the Eighth Circuit, relying on legislative history, has held that discriminatory termination claims can be brought under section 1981. *Hicks v. Brown Group, Inc.,* 902 F.2d 630 (8th Cir.1990); *see Kriegel v. Home Ins. Co.,* 739 F.Supp. 1538, 1540 (N.D.Ga.1990) (following *Hicks* without much discussion).

Although the *Hicks* court acknowledged that courts should be "wary of reading too much into legislative history," *id.* at 643 n. 32, the court ignored the language of section 1981 and engaged in an analysis of the legislative history of that statute. The court justified this analysis by observing that the statute, as illuminated by *Patterson,* is ambiguous about whether it encompasses discharge claims. *Id.* at 642 n. 31. The court also implied that a literal reading would reach an odd result, and observed

---

**7.** Although the opinion contained an alternative holding, the holding concerning *Patterson* was not dicta. The holding read in full:

We agree with the district court that *Patterson* forecloses this claim. Putting *Patterson's* bar aside, we also find nothing in the record before us that would permit a jury to find for appellant on her section 1981 claim. The entry of summary judgment was therefore appropriate.

*Thompkins,* 916 F.2d at 601.

**8.** *E.g., Gonzales v. Home Ins. Co.,* 909 F.2d 716, 722 (2d Cir.1990) (ordinary claims that termi-

nation discriminated against plaintiff not cognizable under § 1981); *McKnight v. General Motors Corp.,* 908 F.2d 104, 108–109 (7th Cir.1990) (Posner, J.) (plaintiff's "right to make a contract" was not infringed when he was fired); *Courtney v. Canyon Television & Appliance Rental, Inc.,* 899 F.2d 845 (9th Cir.1990) (claim that discharge was racially motivated did not raise a cause of action under section 1981); *Lavender v. V & B Transmissions & Auto Repair,* 897 F.2d 805 (5th Cir.1990) (no viable claim for discriminatory discharge under § 1981).

that the Supreme Court often interprets section 1981 with reference to legislative history. *Id.* Then the court discussed the drafters' vision of the broad scope of section 1981:

> The free contract system was seen as essential to the radical reordering of southern society.... Congress therefore passed an intentionally broad act, in order to insure the former slaves the meaningful exercise of their rights in the face of manifold southern resistance.
>
> Given Congress' acquaintance with and concern about the varied forms of southern intransigence, we doubt that it would have subscribed to an interpretation of Section 1981 that secures the equal right of the freedmen to make contracts at the formation stage, but then abandons them after the contract is formed.

*Id.* at 648. The Eighth Circuit concluded that the right to make contracts forbids discriminatory discharge, and that discriminatory discharge claims are therefore cognizable under section 1981. *Id.*

In *Patterson* the Supreme Court noted that the limited reading of section 1981 "preserve[s] the integrity of Title VII's procedures without sacrificing any significant coverage of the civil rights laws." 109 S.Ct. at 2375. The Eighth Circuit, in *Hicks*, addressed this concern, noting:

> Nor will permitting Section 1981 actions for discriminatory discharge subvert Title VII's preference for mediation and conciliation. After an employee is discharged, the employment relationship is severed. At this point, there is no relationship to salvage. The absence of an employment relationship makes discharge equivalent to a refusal to contract.

*Hicks,* 902 F.2d at 640.

With all due respect to the Eighth Circuit, this Court does not find its reasoning persuasive. The *Hicks* court confused a search for legislative intent with an analysis of the broad purpose of a statute. The broad purpose of section 1981 undeniably was to eliminate discrimination in contracting. This broad purpose does not give courts the power to ignore the language of

the statute. As the Supreme Court observed:

> The law now reflects society's consensus that discrimination based on the color of one's skin is a profound wrong of tragic dimension. Neither our words nor our decisions should be interpreted as signalling one inch of retreat from Congress' policy to forbid discrimination in the private, as well as the public, sphere. Nevertheless, in the area of private discrimination, to which the ordinance of the Constitution does not directly extend, our role is limited to what Congress may do and has done.

*Patterson,* 109 S.Ct. at 2379.

■ That the courts' role is limited does not mean that courts may ignore a broad intent of Congress. Indeed, in any exercise of statutory construction, a court's foremost duty is to give effect to the intent of Congress. *E.g., Solis–Ramirez v. United States Dep't of Justice,* 758 F.2d 1426, 1431 (11th Cir.1985); *Frey v. United States,* 558 F.2d 270, 272 (5th Cir.1977), *cert. denied,* 435 U.S. 923, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978). The first step in this performance, however, is to look to the plain language of the statute. *E.g., Pennsylvania Dep't of Welfare v. Davenport,* —— U.S. ——, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990); *Hudgins v. City of Ashburn,* 890 F.2d 396, 405 (11th Cir.1989); *Cabalceta v. Standard Fruit Co.,* 883 F.2d 1553, 1559 (11th Cir. 1989). The search for legislative intent begins and ends with the language of a statute unless (a) the language is ambiguous, *Alarcare Home Health Servs., Inc. v. Sullivan,* 891 F.2d 850, 856 (11th Cir.1990); (b) legislative history shows that Congress clearly expressed an intent contrary to the plain language of the statute, *id.; Hudgins,* 890 F.2d at 405; or (c) the apparent clarity of the language leads to an absurd result when applied, *American Trucking Ass'n v. ICC,* 659 F.2d 452, 459 (5th Cir. Unit A Oct.1981), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 493 (1983).

■ In this case, the search need not go beyond the language of the statute. A statute's language is not ambiguous merely because the parties disagree about its

meaning. *In re George Rodman, Inc.*, 792 F.2d 125, 128 n. 8 (10th Cir.1986). Only inescapable ambiguity justifies a foray into legislative history. *Solis–Ramirez*, 758 F.2d at 1430; *United States v. Garcia*, 718 F.2d 1528, 1533 (11th Cir.1983), *aff'd*, 469 U.S. 70, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984). Here, the language is clear and unambiguous. The statute gives all persons the right to "make and enforce contracts." Nothing in that language addresses discriminatory discharge.

Moreover, the literal interpretation of the statute does not lead to an absurd result, nor is there a clear expression of a contrary intent by Congress. As the Supreme Court has noted, statutes in which Congress expresses an intention contrary to the language of the statute are rare. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). Further, the Court has indicated that "only the most extraordinary showing of contrary intentions ... would justify [alteration of] the 'plain meaning' of the statutory language." *Garcia v. United States*, 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984). Furthermore, the clear indication of contrary intent must inform "the specific language in question." *Consolidated Rail Corp. v. United States*, 896 F.2d 574, 578 (D.C.Cir.1990). The legislative history cited by the Eighth Circuit helps to understand the overall purpose of the statute, but it does not suggest that Congress intended that the right to make contracts include the right not to be terminated in a discriminatory way.

It is clear that the language of section 1981 compels this Court to hold that the plaintiff cannot sue for discriminatory discharge under this provision. The *Patterson* decision supports this view, and so does *Sherman v. Burke*, in which the Eleventh Circuit held that a retaliatory discharge claim is not cognizable under section 1981. 891 F.2d at 1534–35. The court explained, "Here, the retaliatory conduct occurred after Sherman had entered into a contractual relationship with Burke. In fact, that relationship had terminated. Therefore, Sherman has no cause of action under section 1981." *Id.* at 1535 (footnote omitted). The reasoning of this case also applies to a discriminatory discharge claim.

Although Al–Hashimi alleges that the offer of part-time work at less than half of his previous salary was tantamount to a notice of termination, it could be construed as a demotion rather than a termination. Section 1981, however, does not encompass claims of discriminatory demotion. *Frazier v. First Union Nat'l Bank*, 747 F.Supp. 1540, 1547–48 (W.D.N.C.1990) (demotion by removing supervisory duties not actionable under section 1981); *Newton v. A.B. Dick Co.*, 738 F.Supp. 952, 955 (D.Md.1990) (demotion from corporate account manager and subsequent discharge not actionable); *Williams v. National R.R. Passenger Corp.*, 716 F.Supp. 49, 51 (D.D.C.1989) (downgrading of position from "manager" to "chief" not actionable under section 1981, nor can defendant's act be characterized as "refusal" to enter "new" contract), *aff'd mem.*, 901 F.2d 1131 (1990). The analysis that leads to the conclusion that discriminatory discharge claims are not actionable under section 1981 also applies to discriminatory demotion claims. A demotion does not interfere with a person's right to make or enforce contracts. Instead, it is "postformation conduct by the employer relating to the terms and conditions of continuing employment." *Patterson*, 109 S.Ct. at 2367.

Both the language in section 1981 and *Patterson*'s interpretation of that language compel the Court to adopt a narrower interpretation of section 1981 than the plaintiff would like. In *Sherman v. Burke*, 891 F.2d at 1534–35, the Eleventh Circuit explicitly stated that retaliatory discharge claims could no longer be brought under section 1981. This Court now holds that claims of discriminatory discharge or demotion likewise may not be brought under section 1981. 891 F.2d at 1534–35. Al–Hashimi makes no claims that go to the heart of his right to make and enforce contracts. Thus, the Court grants summary judgment for the defendants on the section 1981 claims.

## III. Title VII and the ADEA

Al–Hashimi also seeks redress for the alleged discrimination against him under Title VII and the ADEA. Congress enacted Title VII to remove "artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classifications." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The statute does not purport, however, to limit other qualities that employers may consider in making employment decisions. Title VII merely "eliminates certain bases for distinguishing among employees while otherwise preserving employers' freedom of choice." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239, 109 S.Ct. 1775, 1785, 104 L.Ed.2d 268 (1989) (plurality opinion).

The ADEA, enacted three years after the Civil Rights Act of 1964, prohibited many of the employment practices forbidden under Title VII. *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978). The purpose of the ADEA is to "promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b) (1988). The ADEA prohibits employers from deciding hiring, discharge, and training issues based on age. 29 U.S.C. § 623(a) (1988). Because of the parallel aims of Title VII and the ADEA, the pattern of proof developed under Title VII was adapted to the ADEA. *See Grigsby v. Reynolds Metals, Co.*, 821 F.2d 590, 594 (11th Cir.1987).

**9.** For a helpful discussion of the interplay between summary judgment standards and the *McDonnell Douglas* burden shifting formulation, *see,* Note, *Summary Judgment and the ADEA Claimant: Problems and Patterns of Proof,* 21 *Conn.L.Rev.* 99, 121 (1988).

**10.** The *McDonnell Douglas* and *Burdine* burden shifting analysis still remains good law after *Price Waterhouse,* in which the Supreme Court noted:

### A. The Three–Part Burden Shifting of McDonnell Douglas [9]

Title VII does not require a plaintiff to produce direct evidence of racial animus, sexual harassment, or retaliation to recover. Instead, plaintiffs may recover with only circumstantial evidence, using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and clarified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[10] The *McDonnell Douglas* framework also applies to ADEA claims. *Grigsby*, 821 F.2d at 594. In *McDonnell Douglas*, which involved a claim of racial discrimination, the Court explained that "the complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *Id.* As the Supreme Court noted in *Burdine:*

> Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

450 U.S. at 254, 101 S.Ct. at 1094.

If the plaintiff proves the prima facie case, then the burden of production shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. "It is sufficient [to meet the burden of production] if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Bur-*

> Our holding casts no shadow on *Burdine,* in which we decided that, even after a plaintiff has made out a prima facie case of discrimination under Title VII, the burden of persuasion does not shift to the employer to show that its stated legitimate reason for the employment decision was the true reason.

490 U.S. at 245, 109 S.Ct. at 1788 (plurality opinion) (citation omitted).

*dine,* 450 U.S. at 254–55, 101 S.Ct. at 1094. The defendant's explanation must be legally sufficient to justify a judgment in his favor, and it must be set forth by admissible evidence. *Id.* at 255, 101 S.Ct. at 1094–95; *Whatley v. Metropolitan Atlanta Rapid Transit Auth.,* 632 F.2d 1325, 1328 n. 2 (5th Cir.1980).[11] If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted. *Id.*

If the defendant can rebut the prima facie case, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but a pretext for discrimination. *Id.* 411 U.S. at 804, 93 S.Ct. at 1825. To decide whether the defendant's explanation is pretextual, a court may consider evidence that the defendant submitted to establish the prima facie case. "Indeed there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation." *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10. On the other hand, "[i]n some cases the defendant's evidence of a legitimate, non-discriminatory reason for its actions may be so strong as to rebut completely the inference raised by the plaintiff's prima facie case." *Grigsby,* 821 F.2d at 596. In those cases, the plaintiff must introduce additional evidence of pretext rather than "merely rest[ing] on the laurels of her prima facie case." *Id.*

■ Regardless of whether it was presented to establish the prima facie case, some concrete evidence must be produced to show that the proffered reason is mere pretext. *Earley v. Champion Int'l. Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990). "Mere conclusory allegations and assertions will not suffice." *Id.* Furthermore, "[w]here the defendant's justification evidence completely overcomes any inference to be drawn from the evidence submitted by the plaintiff, the district court may properly acknowledge that fact and award summary judgment to the employer." *Grigsby,* 821 F.2d at 596. Moreover, "the plaintiff always bears the ultimate burden of proving discriminatory treatment by a preponderance of the evidence." *Earley,* 907 F.2d at 1081. As the Supreme Court explained:

> This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

**B.** *Prima Facie Case*

In an employment discrimination case, a plaintiff may establish a prima facie case in three ways: by presenting direct evidence of discriminatory intent, by meeting the *McDonnell Douglas* test, or by demonstrating through statistics a pattern of discrimination. *Earley,* 907 F.2d at 1081. Although Al–Hashimi alleges that Paine College had a pattern of discriminating on the basis of race, he offers no statistical evidence whatsoever of this pattern.

Furthermore, Al–Hashimi has produced no direct evidence that the college discriminated against him based on his race, national origin, or age. "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact [in issue] *without inference or presumption.*" *Id.* at 1081 (adding emphasis and quoting *Carter v. City of Miami,* 870 F.2d 578, 581–82 (11th Cir.1989)). As the Eleventh Circuit has noted:

> [O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, ... constitute direct evidence of discrimination. One example of direct evidence would be a management memorandum saying, "Fire Earley—he is too old." But the evidence at issue here, at most, suggests discrimination, leaving the trier of fact to infer discrimination based on the evi-

---

**11.** The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981).

dence; by definition then, the evidence is circumstantial.

*Earley*, 907 F.2d at 1081–82 (internal quotations omitted).

■ Al–Hashimi alleges, and the Court must assume, that Scott told him, "Mr. Al–Hashimi, you are 60–some–years old, and you are from the Middle East. You talk differently from the other." One could infer from this remark a desire on Scott's part to terminate Al–Hashimi because of his age, race, and national origin. Nothing in the statement, however, indicates directly that Scott intends to use these facts as a basis for a decision to terminate Al–Hashimi. Although Scott denies making the statement quoted above, he does admit that he might have mentioned Al–Hashimi's accent in a conversation concerning the students' complaints about their inability to understand Al–Hashimi's lectures. Such constructive criticism is certainly legal. *E.g., Carino v. University of Oklahoma Bd. of Regents*, 750 F.2d 815, 819 (10th Cir.1984) (a foreign accent is a legitimate justification for adverse employment decision only if the accent interferes with Title VII claimant's ability to perform duties of position). The reference to Al–Hashimi's age is more difficult to justify. Nonetheless, it is clearly not direct evidence of discrimination.

■ Al–Hashimi can attempt to demonstrate a prima facie case of discrimination, however, by using circumstantial evidence. In the usual discriminatory discharge case, a plaintiff may prove his case with circumstantial evidence by establishing: (1) he is a member of a protected minority, (2) he was qualified for the job from which he was discharged, (3) he was discharged despite his qualifications, and (4) the employer filled his position with someone outside of the protected class. *Hawkins v. CECO Corp.*, 883 F.2d 977, 982 (11th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 2180, 109 L.Ed.2d 508 (1990).

Al–Hashimi is a member of a protected minority: he is over 40 years of age, he was born in a foreign country, and he is an Arab. Furthermore, although the defendant disputes the characterization, it is clear that the plaintiff was discharged from his position. The part-time, terminal job was tantamount to a one year notice of termination. Al–Hashimi was told that, unlike a renewable year-to-year contract, his contract would not be renewed.

■ The parties argue primarily about whether the plaintiff has demonstrated the fourth element. Paine College did not hire a new teacher to fill Al–Hashimi's position. Instead, the college split his course load between two faculty members: a black woman and a white man, who are both of a different race and national origin from the plaintiff. The defendant argues that since no new faculty member was hired, the plaintiff's position has not been "filled" by anyone. The Court agrees with the plaintiff that this technicality should not be used to circumvent the plaintiff's rights under the statute.

■ Court decisions in reduction-in-force cases provide a helpful analogy. In those cases, no one "fills" the plaintiffs' positions because the employer seeks to eliminate the position. In this case, there is no evidence that Paine intended to reduce the total number of faculty, but the analysis may be helpful nonetheless. Generally, a plaintiff may establish a prima facie case of discrimination in a reduction-in-forces case by showing (1) that he was in a protected group and was adversely affected by an employment decision, (2) that he was qualified for his position at the time of discharge or demotion, and (3) evidence by which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of age, race, or national origin. *Earley*, 907 F.2d at 1082.

Under this three-part test, it is clear that the plaintiff has established the first element by his national origin and age. From Scott's statement about Al–Hashimi's age, national origin, and accent, a fact finder could infer that Scott intended to discriminate against him on those bases.[12] Thus,

---

**12.** The plaintiff cannot establish a prima facie case under the ADEA using the ordinary *McDonnell Douglas* test because the people who filled his position were not under forty. How-

the plaintiff has established two of the three elements.

Under either the reduction-in-force case test or the ordinary four-part *McDonnell Douglas* test, however, the plaintiff must establish that he was qualified for the position he held. The plaintiff has produced no evidence to suggest that he was qualified for this full-time teaching position. Without proof of this essential element, the Court must grant the defendant's summary judgment motion. As noted above, "[w]here the record, taken as a whole could not lead a rational trier of fact to find for the nonmoving party, then there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *see Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Barfield*, 883 F.2d at 933-34.

Al-Hashimi had, of course, taught classes at Paine for a number of years, but that is not evidence that he was *qualified* to do so. A college may hire a teacher, hoping that he is qualified, only to find that he is not. Moreover, a college may decide to raise its standards, eliminating teachers who do not meet the new, higher standard. As long as a college does not make adverse employment decisions because of a teacher's race, national origin, or age, the college does not violate Title VII or the ADEA.

There is conflicting evidence about Al-Hashimi's qualifications in earlier years. In 1984, Kitchen wrote a letter indicating the department's frustration with Al-Hashimi's slow pace in the World History class. On the other hand, some people thought that Al-Hashimi was qualified to be an associate professor at one time. Coye Williams, a former Academic Dean, and the Rank and Tenure Committee twice recommended that Al-Hashimi be promoted to the rank of Associate Professor. Apparently Scott disagreed with these recommendations, and Al-Hashimi never received the promotion. It is unclear, however, when these recommendations were made, and, as

noted above, the inquiry is whether Al-Hashimi was qualified for the job he held when the college decided to terminate him.

There is no evidence that Al-Hashimi was qualified to retain his position after the "full court press" in 1989. The "full court press" was apparently the college's attempt to eliminate unqualified teachers, and to raise the overall quality of teaching. Whether Al-Hashimi was qualified before the "full court press" is not the question before this Court. Instead, the plaintiff must put forth some evidence that he was qualified for his position at the time he was fired. The Court has searched for evidence of Al-Hashimi's qualifications for the position *immediately prior to his termination*, but has found none. Ultimately, "[p]resenting ... arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court." *Blue Cross and Blue Shield of Alabama v. Weitz*, 913 F.2d 1544, 1550 (11th Cir.1990). Because he has not proven that he was qualified for the position he held when he was terminated, Al-Hashimi cannot establish a prima facie case under either test.

A plaintiff may also establish a prima facie case by showing that he was fired while someone outside the protected class with comparable or lesser qualifications was retained. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir.1984). Al-Hashimi attempts to establish these elements in two ways. First, he avers that Scott replaced Al-Hashimi with a less qualified black man as Division Chair in 1976 or 1977. The statute of limitations has run on any acts committed in 1977, and the Court cannot perceive how this alleged act is related to the actions taken in 1989. Second, he avers that Mr. Hicks, a black male, was given a pretermination hearing in 1989, while Al-Hashimi was not given a formal hearing. Once again, Al-Hashimi does not offer any

ever, the "Mr. Al-Hashimi, you are old ..." statement establishes some circumstantial evidence of an intent to discriminate against the plaintiff based on his age. Nonetheless, under either test, the plaintiff would still need to establish that he was qualified for the job. Player, *Proof of Disparate Treatment under the Age Discrimination in Employment Act: Variations on a Title VII Theme,* 17 *Ga.L.Rev.* 621, 644 (1983).

evidence that Hicks had comparable or lesser qualifications than Al–Hashimi. Thus, even if Hicks had been retained, the elements outlined in *Nix* would not be met. The plaintiff has failed to make out a prima facie case of discrimination. For this reason, the Court will grant the defendant's summary judgment motion on this issue.

### C. *Legitimate, Non-Discriminatory Reasons*

██ Even if the plaintiff had established a prima facie case, the Court would still have granted the defendant's summary judgment motion because the defendant has produced strong evidence of a legitimate, non-discriminatory reason for terminating the plaintiff. Affidavits, letters, and deposition testimony demonstrate that the college terminated Al–Hashimi because of his teaching performance. The specific deficiencies included: (1) failing to keep up with a common syllabus, (2) being absent too often, (3) failing to prepare for class, and (4) failing to make himself understood to some students. The first three problems were mentioned in Scott's February 20, 1989, letter; the other may have been mentioned to the plaintiff at a meeting some time later. At any rate, there is ample evidence that this was the actual reason that the college terminated Al–Hashimi. In fact, there is evidence that these deficiencies were a problem as early as 1984. Because the college had instituted its "full court press" campaign to improve the quality of education at Paine College in 1989, it is plausible that the college would choose that year to terminate Al–Hashimi. Moreover, although Al–Hashimi alleges that the college discriminates in favor of blacks, two blacks were terminated in 1989 also. Thus, even if Al–Hashimi had been able to establish a prima facie case of discriminatory discharge, the defendant would have rebutted that case.

### D. *Pretext*

██ As explained above, once a defendant establishes a legitimate reason for the dismissal, the burden shifts back to the plaintiff to show that this reason is a mere pretext for discrimination. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093; *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25. Deciding summary judgment motions in employment discrimination cases is a delicate matter, for "[i]n general, summary judgment is an inappropriate tool for resolving claims of employment discrimination, which involve nebulous questions of motivation and intent." *Grigsby,* 821 F.2d at 595. Moreover, "a plaintiff need not present evidence in rebuttal in order to demonstrate pretext. A plaintiff may instead 'rely on his initial evidence combined with evidence elicited from the defendant on cross examination.'" *Zaklama v. Mt. Sinai Medical Center,* 842 F.2d 291, 295 (11th Cir.1988) (citation omitted). Nevertheless, the plaintiff "may not in all cases merely rest on the laurels of her prima facie case in the face of powerful justification evidence offered by the defendant." *Id.* at 596. In this case, the plaintiff has attempted to rest on laurels that never existed. Al–Hashimi has failed not only to establish a prima facie case, but also to prove that the college's legitimate reasons for firing him were mere pretext.

Al–Hashimi has offered as evidence of discrimination his own affidavit. He avers that Scott told him, "You are 60–some-years old, and you are from the Middle East. You talk differently from the other." His affidavit also indicates that in the 1970's, Scott relieved him of a Division Chair position. Finally, the affidavit notes that Mr. Hicks, a black man, received a hearing before he was terminated, although Al–Hashimi did not receive a hearing. If there had been evidence that Al–Hashimi was qualified for his position, these pieces of evidence would have established a prima facie case. Even taken together, however, they would not have proven pretext. The evidence of Al–Hashimi's deficiencies in the classroom was "so strong as to rebut the inference [that, with some evidence of the plaintiff's qualifications, would have been] raised by the plaintiff's prima facie case." *Grigsby,* 821 F.2d at 596.

Al–Hashimi does challenge one of the four stated reasons for his dismissal. He challenges the complaints about his inability to keep up with the common syllabus. The text and syllabus for the World History class was apparently developed for a two semester class, but Paine chose to teach the class in one semester. Apparently several teachers have sought a different book and syllabus for this course, and Kitchen apparently has sought to expand the course to a two-semester offering. Even if the Court assumes that Al–Hashimi's inability to keep up with the common syllabus was not a legitimate reason for his dismissal, however, the defendant has offered three other reasons for the dismissal. Al–Hashimi has not refuted the charges that he was absent from class too often, that he was unprepared for classes, or that he could not make some students understand him. Thus, he has not established that these reasons were pretexts for discrimination.

In fact, Al–Hashimi's evidence is weaker than that offered by the plaintiff in *Grigsby*. In *Grigsby*, the plaintiff offered as evidence her own affidavit and several accompanying exhibits. *Grigsby*, 821 F.2d at 596. This evidence showed that the plaintiff's salary appraisal was higher during the relevant period than that of the person who was chosen for the position. This evidence would appear to show that the plaintiff was better qualified for the job than the young man actually chosen. The evidence also showed that the objective standards for the position were not created until after the position was filled. This revelation strongly suggests that the legitimate reasons offered were pretextual. Finally, the plaintiff in *Grigsby* noted in her affidavit that a manager told the plaintiff "the characters the Traffic Manager would have to deal with were pretty rough and he did not want me to have to deal with this type of thing." *Id.* This suggests, indirectly, that the management thought an older woman could not perform the job because of her age or gender. Despite this evidence, the Eleventh Circuit concluded that "Grigsby's testimony and exhibits simply fail to raise any inference of pretext or discriminatory intent." *Id.*

Compared to the evidence produced in *Grigsby*, the evidence in this case is weak. It is clear that Al–Hashimi has not met his burden of showing a genuine issue of material fact that could lead a rational fact finder to conclude that the defendants intentionally discriminated against him because of his race, national origin, or age. Summary judgment for the defendant on the Title VII and ADEA claims is warranted.

CONCLUSION

The plaintiff's claims, whether characterized as discriminatory discharge, discriminatory demotion, or retaliation, are not cognizable under 42 U.S.C. § 1981. The defendants' actions cannot be construed as interfering with the plaintiff's right to make or enforce contracts. The language of the statute and the Supreme Court's decision in *Patterson* make it clear that section 1981 does not prohibit discrimination in the form of postformation conduct. The Eleventh Circuit has held that retaliation is postformation conduct that cannot be reached by section 1981. Although the Eleventh Circuit has not decided whether discriminatory discharge or demotion is cognizable under section 1981, the weight of authority and the rationale behind *Patterson* persuade the Court that it is not. Accordingly, the defendant's summary judgment motion is GRANTED on the section 1981 claim.

Although the plaintiff's claims under Title VII and the ADEA are cognizable, the plaintiff has failed to make out a prima facie case of discrimination under these statutes. Moreover, even if he had demonstrated a prima facie case, the defendant has provided several legitimate reasons for the action the college took. Although the plaintiff has challenged one of these reasons, he has offered no evidence to show that the other reasons are pretextual. Thus, he has not met his burden on these claims, and the Court GRANTS summary judgment for the defendant on the Title VII and ADEA claims.

Although Scott is the only defendant who filed this motion for summary judgment, all of the arguments apply to the other defendants as well. Accordingly, this order applies to all defendants. There are no issues left for trial.

SO ORDERED.